Good morning everyone, and please be seated. People v. Schatzfather If all the attorneys, or the attorneys, that are going to present oral arguments, could you step up to the podium and identify yourselves for the record? My name is Warrington Parker. I'm appearing on behalf of Schatzfather. Mr. Parker. Yes, ma'am. Good morning. Good morning. All right. And? Good morning. I am assistant public defender Celeste Adaman. I'm here on behalf of the appellee, Mr. Merritt Jones. Adaman? Ms. Adaman. Adaman. Good morning, Ms. Adaman. Thank you. All right. And we have? Jonathan Byer. Assistant State's Attorney, Supervisor of Civil Appeals for the Cook County State's Attorney's Office. All right. For the people. So you've weighed in. We've weighed in. And we'll defer to any questions of the court. We can rest on our brief. That simplifies matters. All right. Questions I'm glad to answer, but otherwise. Okay. Well, I think we can take your position from your brief. So that will then leave us with Mr. Parker, Adaman. Each of you will have about 15 minutes to present oral arguments. And from that, Mr. Parker, you may save some time out for rebuttal. All right. Very good. All set? Yes. Did you want to say a specific amount of time for rebuttal? Five minutes. I was going to. That's what I was asked to. I am doing that. Because of the issues, we're suggesting that you kind of focus on that as opposed to the jurisdictional argument that the public defender has raised. I think I beat that argument, so I won't. All right. You may proceed then. May it please the court, my name is Warrington Parker, representing Schott's father. I think I'd like to table set to begin with on three points. The first is Schott's father has provided information in response to the subpoena. Number 41. Mr. Parker, if I could cut you off. Yeah, absolutely. Before we even get to the issue, you've contended that the center of review is DeNova. I did. So I'm looking all over for this. It's constitutional or privileged. Where are you getting this DeNova? From the case cited, and it's affectionately not disputed. So I would just base it on that. It is very much disputed, Mr. Parker, so I would not skip right over that one. Let me say a few different things. I understand the court is disputing that. And I don't mind if the court applies a different standard of review. Oh, would you say that the public defender has agreed to a different standard of review? They did not dispute it in their brief. That's all I'm saying. I understand the court has an issue with it. And so I would just have to rely on the case for the DeNovo standard that we cited. And we did say that if the court disagrees with that, then it's a different standard of review applies. But the underlying facts are not in dispute in terms of what is requested, what the status of the case is. Those are not in dispute. We're disputing the court's decision based on those facts. And that's why we said the DeNovo standard. Well, what about the Supreme Court case that we think is really contrary to your position? If the court disagrees, I'm more than happy to rely on a different standard of review. I don't want to fight about this overly much. All right. Okay. Well, then, proceed. Thank you. So as in all cases in which ShotSpotter receives a subpoena, and here, ShotSpotter does provide information. And ShotSpotter here provided, it's not in the record, but it's 243 pages of documents and audio files. ShotSpotter provided information about the sensors that were relevant that were alerted here. ShotSpotter provided the studies that were requested. ShotSpotter provided the audio files so that if anyone wanted to contend that it's not gunfire, they can actually bring someone in and do that. What we're objecting to is the court's finding that if the state makes ShotSpotter relevant, then this additional discovery would thereby be relevant. Well, what does it have to do with if the state? This is a defense case. The public defender's office is representing Merrick Jones. Correct. They are contesting their ability to defend their clients on criminal charges that arise out of an arrest report that says that the police responded to a gunshot at a given location. So this isn't really about what the state's going to do. Understood. This is about the defense of a criminal case. So with that in mind, I think you should address it. And so the Nixon standard requires that something be material and evidentiary. Is the term evidentiary relevant? Not yet, because... Well, what does Nixon say? Give us the first factor. Now you're saying it's material and evidentiary. Material and evidentiary. Okay. Right? And there is currently nothing on file to which this ShotSpot alert is relevant. In fact, at least before this... Whoa, whoa, whoa. The standard in the wording of Nixon is not what you said. Oops. Material thought is evidentiary and relevant. Go ahead. Okay. So we have no testimony, correct? We have no testimony. We just have the positions of the attorneys. Correct. Okay. But we do have the arrest report. And in the arrest report, it states no less than three times that they were stopped pursuant to the ShotSpot alert, that the officers pursuant to that ShotSpot alert heard the vehicle, and that pursuant to that ShotSpot alert, the officers did an investigation. I agree. Okay. So they do say that the defendant drove away from the underground eastbound into Garfield Park. I agree. But no less than three times have they mentioned ShotSpot as being the basis for the stop. I agree. So I'm not sure how we're getting that it's not going to be relevant what the basis of that stop was. Because I don't know what the state is going to do. It doesn't matter. But they did a motion to say that. Okay. So the state could say we're going to rely on the fact that Joe Boe said that this guy had a gun in his car. Yes. But if their arrest reports are giving different indications, the defense can rely on that. So it's irrelevant what the state could or might argue. I'm not disputing that. Right now, though, the defendant has not even indicated that they're going to file the motion to suppress. Well, do you expect them to wait for months to determine what their strategy is? The charge is pending. And it's obvious that the defense subpoenaed ShotSpot, not the state attorney. So the interests here have nothing to do with the state at this point. The question is, is this information relevant to the defense when their client was stopped allegedly because of a gunshot? That's the issue. They're the ones seeking the information, not the state. I don't think you cited a single case that has anything to do with whether the state decides they're going to use this information. What case are you talking about? Let me back up. Sure. First, let me just say a few things. First, when I say it's not relevant right now, there is nothing pending to which it is relevant. I understand. Well, I guess you don't understand that this is a criminal trial. The case is entitled People of State of Illinois v. Merritt Jones. Merritt Jones has been charged with six counts of aggravated driving under the influence of alcohol. He's been appointed a public defender to represent him. The public defender's interest in defending their client arises out of the Sixth Amendment. They want to be able to defend their client. They have a good basis right now for seeking material that's relevant to their defense. The defense in this case is going to be, I don't think there's any question, that the arrest was lacking probable cause and or there was no basis for a charge not. So the question is, just wait, how can you possibly say that the arrest circumstances are not relevant and how those circumstances arose are directly related to the officer's statement in a report three times that we responded to a call of a gunshot. That wasn't even actually the location. Let me try it a different way. Sure. I'm certainly saying the circumstances of his arrest are relevant. Sure. What I'm saying is that discovering order in connection with this is not relevant. That's what I'm really saying. That's why I started by saying we have actually produced information pursuant to subpoena without challenge, without seeking a motion to quash. But the trial court did go through the subpoena request and did make determinations of what would be relevant and they narrowed the scope of all of the subpoenas. Yes and no, and let me give an example. There's, we call them 7.1 and 7.5, for example. That's with all protocols, procedures, and similar documents since from the very beginning, 1996 and for every city. It was not limited in any way, shape, or form. Did the court limit it in the ruling? No. Another one is the court asked for all- I thought it was asking, or maybe I'm misremembering this, that it was limited to the protocols that were in place for the people at the time that the Shots Fired Alert came in. What now is the 25 years going to have? I don't know. It's 845C211. Request 7.1, 7.2, 7.3, and 7.4, Shots Fired's motion to quash these requests are denied. Okay. So you're saying it's going back 25 years? That's how I read it. I would love not to- Well, that's probably something that you and counsel could have worked out quite easily. But I think defense counsel will disagree with you that the court's order suggested 25 years for the policies and procedures. If that's true, I will stand to be corrected, but I'm just saying that's how I read the court. Okay. The next thing I would say is I would like the court- it's under the two series, which is all disagreements back and forth between Shots Fired and the algorithm. The court limited that to three months before November 7th and three months after November 7th. That's for the entire city of Chicago. The issue with that is there are thousands and thousands of alerts in that period of time, and people don't disagree. The individual makes the decision. There's not a disagreement between the algorithm and the people. So, in other words, that doesn't tend to show one way or another about this particular arrest. And information about this particular arrest has been produced. And I keep coming back to it because I think the court somehow thinks- The only thing that's relevant for the defense in this case. Currently, I do believe that. Okay. And what if you're wrong about this? If there isn't any exploration about other incidents and their reliability, I mean, why wouldn't that be relevant? And as I said, the court will, of course, disagree as it wishes. There are courts that will- the Second Circuit, for example. In what case are you relying on for that? Yes. There's a- There are three cases. Okay. There's circuits that say that this system isn't reliable, and then there's circuits that say it is. And then we have those cases that you cited where actual police officers testify. That's correct. We don't have that yet. We're not even at that point. We have no control over that at all. No, but this is free trial. This is free trial. And those are the cases I was going to cite to this court, page 25 and 26 of our brief, where courts have allowed officers to testify about the reliability. Yes. And so that's part of the reason also all the other materials sought are not relevant. And how do you know? How do you know? How do you know? No. How do you know, standing before this court, that there's a single police officer in Chicago that could testify about the reliability? And if not, then that's a- Well, you said it's free trial. Right. And you're expecting this to go through some process where they're going to wait and see, and you're going to wait and see, and we're going to wait and see if there are police officers in the city that can say, well, I responded to 500 calls or 50 calls, and I'm familiar with this particular area, and every gunshot alert that we got was accurate. I mean, we don't know any of this. As a third party, I think I'm entitled to make that request under the Nixon standard to be perfectly frank. I don't think so, because you don't have anything that suggests right now there's anyone within the Chicago Police Department that can in any way testify to the reliability of this discussion. That's between the state and the defendant at this point. No, it's the exigence between the defense and your company right now. They were subpoenaed, not the state. I understand, but I'm saying under- the court's going to likely disagree with me. Well, we don't know. If I were in the position of a non-third party, I would say to this court, you're right, this is going to be a hard one for me to win. But I'm a third party. If it's a defendant- Third party is providing the information that is at the heart of the subpoena. At the heart of the subpoena, correct. I don't even know if it's at the heart of the subpoena. No, and the appeal- I agree with that, too. I agree with that. But when it's at the heart of the case, this is precisely why all we're asking is for exactly what the court is wondering about, which is, is there somebody who can do this? I don't know. And if there isn't, that's a reason to come and come back and say, this needs to be tested. Okay, now let me ask you this. Yes. It's apparent from reading this record and these briefs that at some point, the defense is going to want to test the reliability of your process. And I didn't read a single case that you cited where someone has actually testified about the reliability of this system. Yeah, I understand. And normally, it would be your company that would provide that information. The police department can't testify at all about this. And even though you suggest that that's where this belongs, how could you possibly suggest to this court that Shots Fired, or rather, the police department, should be the ones that provide the reliability of your process? That's interesting. So, I want to- let me make sure I don't over- for reasonable suspicion and probable cause, that's the only thing that those cases at page 25 and 26, 13. Shots Fired has always provided a witness to testify about its reliability. And that would do so in this case as well. So, why aren't there any cases that actually suggest this? Because we didn't cite to the underlying court that there- Shots Fired has survived 20 Delbert and Kelly flight hearings. It has never been found to be underlined by any court. Okay. What about the- I've never gone in Illinois. No. It's been in California, Missouri, New York, and New Jersey. I believe those are the cases. And did all those other states have reports from the office of their inspector general that indicated that the reliability is 9% or thereabouts? No, and that's actually- the inspector general just cannot place that- the last paragraph says we can't place this. They don't have the information to say that this is directly tied to Shots Fired. Okay. Mr. Parker, could we turn to the re-classification notes one more time? Yes. So, it's three months prior to the incident and three months post-incident. Correct. Does Shots Fired have the ability to collect that information? Yes. Okay. With regard to the calibration logs, I'm assuming they keep them? I'm assuming so, too. Okay. So, they have the ability to attend to that as well? Yes. They do have policies and procedures that are in place for all of the review of the audio files, is that correct? Yes. And those policies and procedures, I assume, are updated at certain- I don't know the answer to that, but- But we can assume that at any given point in time, there's a policy and a protocol that's involved. Yes. And are there any Chicago-specific validation studies? No. No. I'll say that we have that in place. Okay. Thank you. Did the court, the trial court, did she limit the information that she ordered to be provided to the attorney of the case only and no others? I actually don't remember that. We did have a request for protective order and I believe that was entered. Yeah, I believe it was, too, but you're not sure. I just, since that wasn't one of the things I focused on in this argument, I can only say I believe so. I can't say more than that. But I believe there is a protective order. So all of the information that the court ordered you to turn over, you have? Yes, with the only exception that the 2.4, 2.5 are not really held just by the works and so we would have to talk to- So you would clarify that, say the information is not available or we normally respond to a subpoena that's not responsible. Correct. Okay. Thank you. Explain to me this thing about reclassification. Sure. There are instances, reclassification is a term of art for shots fired. There are certain instances where, for example, if there are multiple gunshots, multiple gunshots that occur, the computer, which will then send the information to a human being to be listened to, may classify one of the first ones as something different and therefore it doesn't get into the review. Does that make sense so far? Let me start again. When there's a noise that the computer believes sounds like gunfire, it forwards that information to a human for review. Right. All right. Without assessment. It provides an algorithmic number, like it has 96.8%, which means essentially, and this is in the very grossest of terms, this has characteristics that I know to be gunfire. But that is not- You mean the machine knows to be. I'm sorry? The machine knows to be. This begins with the machine. The machine is the computer. Correct. Okay? Yes. All right. The machine is telling us this. All right. No, the machine's not telling you. It goes to a human being with good shots fired. How did it get to the human? The machine forwarded it. Okay, that's all I meant. Okay. I thought maybe- So it gets to a human now. In this case, let's talk about this one thing. Yeah, sure. There was one report. Yes. Okay, so go on. And the person determines whether it's gunfire by listening to the audio wave and then forwards it along. Right. But how- My question was, tell us about briefs, classifications. I just wanted to lay the groundwork. Yeah, I think we know that part. We understand that part. Okay. If there are multiple gunfire report samples that happens all at once, the machine may take some of that gunfire and move it over and say, that doesn't sound like gunfire. Let me forward this along to the reviewer. So, for example, if there were six shots in actuality, the machine may only forward four of those shots. The censors get overwhelmed. Human reviewers, for example, the expert- Mr. Berger, on each one of those shots, does it give that same assessment, 96, 72? Yes. Okay. The human reviewer will go back to the audio file later on, after the alert, after whenever, for example, the defense counsel wants subpoenas or the state subpoenas, and they'll listen to all of the audio files related to that event. And they may reclassify in the event, in those singular events. Okay, so that's really my question here. This is what I want to know. You just jumped from, it just automatically, did the human person in this scenario we just have, you're suggesting they didn't reclassify it, right? There wouldn't have been a reclassification in the real-time alert. Okay, so a reclassification only occurs when? A reclassification would occur if there were an alert. After the alert goes off, the person is, whatever happens, somebody subpoenas the information from shots counted. The forensic person will go through and listen to all of the gunfire that's associated with that event. And there are no times when at least one of the gunfire was not caught by the sensor. It's all on the same event. It just wasn't caught. Okay, but what I'm asking you is this. This only happens when somebody actually complains or suggests this. Okay, so then let's go back to the scenario you've described. These sounds are indicated to the human that this is an alert that should go out, right? Yes. Okay, so the person... No, that's not right. Okay, well then explain it to me again. Sure. The computer reports the sounds to a person. Yeah. The person makes a decision whether it's gunfire or not. Okay. If the person says it's not gunfire, nothing happens. All right, so the reclassification is always after the fact. It would never be in the first instance. That's exactly right. But a human could say that, and is it just a matter of listening? Yes. So the person that's doing this is simply listening and deciding whether or not that sounds like a gunshot to the person. Absolutely. When does the alert go to the police? Immediately. Immediately, so this analysis that's happening with the human may be well after the police have been dispatched. For a reclassification, definitely. Okay. That happens afterward. And, again, it doesn't mean that the gunfire didn't occur. It's usually an instance of multiple gunfire. So it's just picking up extra gunfire, not like it's reclassifying the entire... Okay, you know what? Now that you've mentioned this, so would you suggest that the lawyers representing this particular person, that they would have absolutely no interest in knowing how the human person is listening and deciding, and there's nothing that that person has as far as training to determine that the machine got it right, because I've listened to it now, and now I agree it's a gunshot? I didn't suggest there was no training. No, I know. I'm saying, but that's what some of the things that they want. They want to know the protocols, the procedures that the human is doing so that that human, who's just gotten an alert, or whatever you want to call it, from the machine, that it's a 99% chance this was gunfire, that that person now is going to determine whether it was or not. I would never make that argument. Well, I'm asking you. I'm saying, wouldn't the defense have a right to know how the human reviewed the machine? And isn't that what they're asking for? If the defense actually brought a motion for anything, a motion to suppress, actually put it at issue. Oh, okay. That's where we are. You're saying everything here is premature. That's what exactly. Okay. Because what I'm also saying is those documents will frame up. You have never seen shots fired here on an appeal. Those documents frame up. What does that have to do with anything? Because the documents, when they're filed, actually frame up. I can then argue or agree. This is definitely wrong. Okay. So why do you think greater than you're free, that this is all premature? I think we did. I don't think you did. I think you're saying that the objective factors, that the police, I mean, you've framed a number of things. But you have never suggested. Well, I guess you have because you said that the judge sort of suggested a theory about a motion to suppress. Yes. In fact, Mr. Parker, didn't you say that the standard for what is relevant when subpoenaing records from a third party is different than when you are dealing with parties discovery? Right? You said that records have to be known to be relevant. Yes. And that differs from the position taken by the defense in this case. Right. Yes. I'm not trying to be obstreperous in just saying no. I understand how some of this information could be valuable. That's not my argument. Okay. So then are you really saying that, are you now saying that the public defender, until they file a motion to suppress, you shouldn't have to turn over anything? Because, yes. Because it frames it up. I mean, listen, we had a trial record where page five of the trial record, the state said, shots fired is not involved in this case at all. And I understand what the police report said. But that frames it in a way. I don't know which to take as true or not true at this point. I don't have a position on whether which is true or not true. I'm just saying if there's a motion to suppress, I actually then know what will be framed up. It may be relevant to a terrorist stop, but I don't know what that means. You don't know what that means? This is why I don't know what it means. I don't know if, though. If there is a pretextual stop of someone, for whatever reason, for whatever reason, wouldn't what goes into that stop be relevant to determine whether or not that arrest is quashed? Yes. So, if there are false notifications of gunshots and there are people being stopped because of false notifications of gunshots, wouldn't that be relevant for them to know how reliable that system is? So, you're not going to let this question, am I right? That's right, Paul. That doesn't matter. You go ahead. You're fighting your life. Technically, from the police point of view, if not the police knew it was a false alert, no, it wouldn't be relevant. That's just the true answer. We've actually cited cases like this. What page are you using, Ted? Here. Let me find the cases. And I told you I wouldn't let you argue. It's not an argument that is very lenient. It's at page 22 to 23 of our briefs. There are five cases cited. And I didn't come to meet with that argument because it's probably the least appealing of the arguments, clearly, that I'm making today. I've heard that all the time. I know the opinion. That is the truth. That is the truth. If they knew, and that's what the government said, in a different sense, from a different place altogether, again, that's what I'm saying, having actual papers that frame things out, it may be that we don't have to look for protocols from 1996. It may be that those are the things that the court below granted this denial of motion to cross the police department. Because one, the court said, if the state makes it relevant. And the second was that there was a policy for police to stop people. And that was the second reason. That has not been defended on appeal because there is nothing in the record indicating the policy. And all I am really saying, when things are framed out, that's a whole different world. And you have not seen, and it's relevant to me to say, you have not seen us up here fighting these things just left and right because typically there is something framing out. But how could, as you know, lawyers have to have a basis in order to make allegations in any motion that's filed in court. How could they have a basis to argue that a shot, spot, or alert is not an appropriate basis for a charity stop? If they don't have the information. I understand. Let me do it in a different way, and I don't mean to, I'm not trying to do it for a jury. I think you're doing a good job. Keep going. I'm sweating. Step one is, this is my world in which I live. First, I'm told by the state's attorney, there is nothing, shot spot has nothing to do with this case. They were driving on the way, and then they saw the guy. Now, of course, it was a block away from actually where the alert was. That's what I know. Well, that's the position that they took during the hearing. That's right. Now I'm told it may be relevant to a charity stop, and Judge McBride chastised me when I said I don't know what that means. No, I know that you know what it means. Yeah. I don't know if that means their position has changed. So the story could be, we were on our way to a shot spot, and we saw the stop. But that doesn't make shot spot very relevant at all. Any more than I was going to pick up my phone. It does if they say that due to the nature of the stop, they immediately ask the driver out of the vehicle to conduct a previously mentioned shot spotted investigation. So in other words, does the arrest report actually frame what is relevant? I don't know. And not the fact that they were on their way and they were a block away doesn't even matter that they were a block away when they saw the stop. But that's what I don't know. I don't know the answer to that question. I don't know the underlying fact enough to understand it. As a Nixon standard, that's what I'm asking for, and I think I'm right to do that. I think it's right to say this is what helps us frame it out. Is there a delay? They could have filed this. We provided the information. They can now file it. But you provided what you wanted to provide, not what you were ordered to provide or what they sought. I mean, I don't know. I think this whole idea that because the state said they probably won't use this, I mean, that has nothing to do with the issue here. This wasn't a subpoena issued by the state. It was issued by the lawyers that are representing this person. And it would actually be ineffective of them if they didn't challenge the arrest. It happens in virtually every case if there's even a hint of something that is lacking in reasonable suspicion or probable cause. I mean, are you suggesting that why don't you suggest to the trial justice, just let's postpone this. This isn't right for review. You'd be giving an advisory opinion about this whole case. Isn't that kind of what you're saying here? Because they haven't filed a motion to suppress or something, that this isn't relevant? I'm saying it's not relevant. Okay, but what he says is that the public defender or the lawyer that's representing his client has to file a motion to suppress in order for you to be satisfied that something's relevant. It's not whether I'm satisfied. It's whether or not the material assault is relevant to something and evidentiary. And this is not evidentiary at all. You're saying known to be relevant, not just suspected. That's the standard you're applying for honesty. And of course that again is entirely different, right? The standard is different, but we have two cases where you can't issue a subpoena in hopes of discovering information. Okay, well tell us about those cases then. Give us those cases. To a third party. To a third party. Okay. The first case is... People v. Cannon. And I'm looking for the page Richard cited. And how does Cannon... It was a case involving prosecutorial request to obtain evidence so that they could bring a selective prosecution motion. The other case is people... And how does that support your position? Because the court said you can't just... You have to have evidence. You can't just seek the evidence and say I'm going to now build a case after that. Okay. And you're saying there is no evidence here at all. That police report is meaningless. And I've never said anything like that. Okay, well, is it or not, there's a police report on file that indicates five, three times that the reason we stopped him was because of a gunshot alert. Yes. But the police are not lawyers. They are not trying this case. I don't know the relationship between... I'm sorry? I don't know how these officers that you suggest are the ones that can talk about this. There's no case in Illinois where any officer is testified to this reliability. Mr. Pepper, did it change your analysis at all that the defendant in this case was not arrested for a gun? Yes. When we heard that not only was he not arrested for a gun but they weren't even... then the shots fired alert has actually no relevance in my view at all. Those two together are important. If there were a shots fired alert and then he was arrested for DUI at that time, maybe it would have been relevant. If there was a motion to suppress fraud and, you know, you claim it was pretextual, those type of arguments are totally understandable. All right? I don't even know if I want to come back up here. What about the general idea that the officers heard that there was a gunshot at this 244 whatever West, I forget the name of the street. And they see a car. Yes. But they don't ever testify that anything that had to do with a gun when they went to the car. There was something that was suggested to them other than the gunshot alert that brought them to the car. Do you agree with that? I'm not sure which car I was supposed to agree with. Well, the report says that they responded to a gunshot alert at a location. Yes, I agree. On their way there, they saw someone in a car. Yes. Okay, well, what else did they see? Or you don't know? Presumably, didn't they see a lot of people in cars on their way there? Yes. Wasn't it the U-turn situation? This is definitely a U-turn. And wasn't there somebody evading the police? If you want what I understand, that's what I understand. And I also understand that there are instances, and we've had the cases, for example, where, you know, the police show up in an area for one reason. They get a 911 call, there's a murder, and they arrest somebody for drunk driving or something completely different. The 911 call falls out of that equation altogether. And in this instance, shots fired could easily fall outside of the equation. And you're asking me, what does the police report say? I know what it says. I don't know if the police will actually testify. And if there were a motion to suppress, then the state would be put to the test of whether or not the police will testify, either consistent with the police report or different. So, actually, the burden would start with the defense, okay? So, this is all about the defense case. I do think you're kind of, like, conflating. I am not. Well, you're saying that the state has the burden to put on evidence that this arrest was proper. Actually, the burden wouldn't start there. It starts with the defense. That's really what's going on here. But they can file a motion to suppress based upon that. And you're basically saying that the court should not do anything because a motion to suppress wasn't filed. There's nothing for it making this material thought evidentiary. And that's like saying that until the defense files a motion to suppress, they have no business getting ready to defend their client because it's not their job. When, in fact, it truly is their job to prepare a defense. And it's obvious from the arrest report, any lawyer, first year out of criminal law, would challenge this particular stuff. So, to say it's not relevant doesn't really hold water. Then they should have. And then I would know precisely what I'm responding to and why precisely. And the court could ask me precisely. I don't think you cited a single case suggests what you're suggesting. I don't think there's a single case here that suggests that the defense can't pursue a defense before trial because a third party doesn't want to bring forth or be obligated to present anything relevant to the system that brought the police to the place where they were. And I think the judge tried to balance the interest of the third party with the fundamental right of the defense in this case. That's really what this is about. It's not about the state attorney's office. I don't think. So, I think that you're suggesting everything is premature. And maybe you'll do it later or would like to do it later. It's not about whether the court has framed it in that way, like or not like. Well, did the judge frame it that way, too? No. You said that she was evaluating it about a policy or something. I'm only pushing back on this. It's not whether we like or don't like producing information or want or not want. It is whether or not we have a legal obligation to do so. Well, let's go back just briefly. You did criticize the judge for suggesting that there was a policy, right? I did not criticize the judge, but I did note that that was one of the bases and it's not supported by the record. And why is it not supported by the record? There's nothing to indicate that. Do you have a contract with the City of Chicago Police Department? Yes. And under that contract, do you have to provide these alerts because they paid for you to provide them to them? We provide the alerts to the City of Chicago, yes. Okay. But there is no policy that police are required to stop any...  What's that? That is not. That would be... That's correct. And that was precisely my argument as well, which is no amount of discovery for us would help on that at all. And none of the discovery here actually does. Well, you'll have some time for a vote. Thank you, Mr. Taxman. I'm looking for a vote. Gentlemen, you may proceed. You ready? Okay. Good morning. In the name of the court, my name is Celeste Sandman. I'm the assistant public defender. I represent the appellee in this case, Mr. Merritt Jones. Ms. Haddon, was there a protective order in there? Judge Howard indicated over our objection that she would be entering a protective order. The actual order was not entered yet, but she did indicate that she would, and we expected that to have happened had those documents been provided to us. Okay, but usually a protective order is entered before the documents have to be provided. That is true. We expected that when we came back to court on July 22nd of 2022, that Judge Howard would enter that protective order, and we would be provided with those materials. As it happened, Schatzfather took a different path, and we have never received those items. So there is no protective order in this case. Do you agree that the protocols requested would go back 25 years? No, Judge, I don't. The court misquoted our subpoena request in their briefing, both below and before the court here. If you go back and look at the actual subpoena, every one of those requests specifies that we're talking about the particular alert in this case, which has identified that there is a flex ID number. So we're asking for- You said that in your briefing, didn't you? It was to relate to this one request and this one report. That's correct. So what was the protocol in effect at that time that this report was generated? That's correct. It's available to the analyst. It's available to the producer. And that is the order that Judge Howard entered this one, limiting the protocols to that one incident. She granted the- She ordered that the subpoena be enforced, and that's what the language of the subpoena was, that it would only be asked for this specific alert. Okay. With regard to the three months prior and three months post incident for the reclassification, that is City-wide, correct? Yes. Well, actually, we're seeking reclassification notices, and actually, Shasta and her argument kind of conflated some of the requests we're making, because there's actually two data sets that we're looking at. One is the reclassification notices that when the human reviewer disagrees with the machine algorithm at the time that the alert is pushed to the Chicago Police Department. So that's one set of data that we're looking for that Judge Howard did after hearing our request. Okay, correct me if I'm wrong. The alert goes out immediately to the Chicago Police Department. The reclassification doesn't occur until much, much later. So you're looking for any time the alert goes out and it's later reclassified? So there's two sets of when the determination might change. There's two times when the determination might change, and we're looking for both of them. And as Mr. Parker noted, reclassification is a term of art that they use, but very simply, what we're looking for, and actually, we didn't. Very simply, what we're looking for is any time when that initial alert goes from the machine to the operator in Shasta, the human Shasta operator. We're looking for any time that Shasta operator disagreed with that initial machine classification. And so what is the time frame usually? Do you have any idea? I'm sorry, I don't think I understand the question. What's the time frame? The alert goes out, the reclassification, it goes to the human who reclassifies it. Are we talking minutes? Are we talking days? Are we talking weeks? It happens very quickly. So one of the things that we do know from the discovery that was provided us, the four-page document, is it does show when the alert was pushed from the machine to the human operator. It takes place typically under a minute. Okay. Yes. Does that impact the alert? Let's say the alert goes out. It goes to the human within minutes. The human says, no, it's not confirmed. Does that cancel the alert, or does that impact? Do we know? I don't know because there was no alert. Mr. Jones would never have been arrested, and I would never be here arguing to you this morning. Okay. Thank you. So everything in the city of Chicago, the Chicago Police Department, sends out their officers in response to these alerts. They do this knowing that only 9.1% of these alerts. How are you getting to that now? That number, Judge? Yes. That's from the Office of the Inspector General's report. No, I know, but you just equated the Office of the Inspector General's knowledge to all the police officers that are out there. So the city of Chicago Inspector General, one, we know from the report, they're using the Chicago Police Department's own data. That is a report of a governmental agency that is admissible in court under Rule 803. It's a report of a governmental agency. And, yes, that report is generated based on data that was from the Chicago Police Department and is known to the Chicago Police Department. So this time, maybe there was a question prior to 2021 as to whether or not the Chicago Police Department as a whole knew how effective this system was. I have a question. So this alert came out at 10.15 a.m. and the police see defendants' vehicle at 10.30, 15 minutes later. Is that relevant to your inquiry at all? I mean, somebody's shooting a gun. They're not going to hang out for 15 minutes is my point. Sure. So couldn't that be also impacting this 9% reliability rate if it takes 15 minutes? It absolutely could, Judge. And, you know, as the court knows, every determination of reasonable articulable suspicion or probable cause is a fact-centered determination. It's the totality of the circumstances. But what I think we can take from the OIG's report is that we know this is a system that doesn't have a very high accuracy rate. We know from our previous subpoena responses in this case that Shots Fired has never conducted any actual validation testing or live fire testing of this system in Chicago. They have no error rate to proffer to us specifically about the city of Chicago, which is important because we're not just talking about a system that's being used nationwide. We're talking about a system that's governed by sound waves and impediments to sound waves, and so the particular landscape that it exists in, that is important and would affect an error rate. So what we're trying to get at here is we know that there's some kind of issue. We know this from the publicly available data, and we're trying to dig, and that is what gives us the reason, the materiality, to dig into this a little bit deeper. And because they haven't assembled the scientifically robust testing that we would expect of a forensic method, this is what we have to do to try to get at what that error rate is and how reliable is this system. So you decided to use this case to basically develop a system for challenging later cases? That's almost what it sounds like. No, no, Justice. This, how am I going to, in this case, if I'm going to file a motion to suppress Mr. Jones's arrest, I have to be able to give the trial court some kind of indication about whether or not the system actually works. And so no, this is absolutely... This isn't the first time that public defender's offices try to get information from Shots Fired, is it? No, no, Justice. Multiple times. There have been requests. Some judges have ruled, usually, maybe against, I don't know. There's something in the record. But this is not like the first rodeo, so to speak, where you're trying to get information for a motion to suppress in all likelihood that you're going to file on this case. Yes, and we have and do file motions to suppress on Shots Fired cases. I'm sorry, what did you say? We have and do and will file motions to suppress on Shots Fired cases. Justice Edmunds, how did this change? I have a couple of different questions here. Okay. How does it change that, one, she wasn't arrested for any gun fire? And does that change your necessity? So it's more akin to they get an anonymous tip that, you know, somebody's doing something, and they go to that area and they find something completely different that has nothing to do with their anonymous tip. Why isn't it like that situation? Well, the first thing, just off the top that we can think about, is the fact that Mr. Jones was arrested with no evidence of having fired a gunshot, that immediately calls into whatever this supposed Shots Fired investigation was, calls that into question. Why does that? I think the argument that the state would make is it's completely irrelevant what brought the police to the area. They then see a crime committed. And I know the state's pivoted off of the arrest report, now saying Shots Fired has nothing to do with it. But doesn't that mean something to us? Does that mean that every single time they arrest somebody for something else, they have to justify why they're in the area? Well, I think in this case we can look at the specific facts of this case, which are there were six traffic tickets that were issued to Mr. Jones. Every single one of those tickets was not for any traffic offense that was observed prior to his stop and seizure by the police department. What about the U-turn and parking blocking the park? Well, two things, Your Honor. One, a U-turn is not necessarily illegal, and nowhere in this record has it been demonstrated or proven or shown that that was an illegal U-turn. Second, the blocking... Why did they include it in the report at some point? It says that he was blocking the park, and then he made a U-turn, so then they stopped him. I can't pretend that I'm in the head of a Chicago police officer, that he included that for whatever reason. Do you think this motorist would have been stopped without those things, without blocking the park entrance, and without making a U-turn and seemingly evading the police by getting out of there and going a different way? Well, evading the police is not a term that's used in the arrest report, to the best of my recollection. We can also look at the fact that there was no citation ever issued for this U-turn, and I think certainly if this was an illegal U-turn or there was some kind of evasion going on, fleeing and eluding is certainly a charge. Well, they say in the report, the one that's really in the record right now before us, actually mentions three times that they first went to his car because of the alert, then in the middle of the report it says that they observed something, then they said a second time they were acting on the report of the gunshot, and then they conclude with the same notion that this was as a result of the shot-fire report of a gunfire shot. That's correct, and I don't think at any point this pivoted from a shot-fire investigation to an investigation of an illegal U-turn or blocking the driveway. I do want to address the blocking of the driveway because that appears nowhere else in the record, aside from the state's sort of off-the-cuff offer. We don't know where that came from. We don't know what statute or ordinance that's supposed to have violated. That's just sort of the state's off-the-cuff representation in response to the trial court asking them for that information. And why are you entitled to this now? There's been some suggestion that this is, like, premature or that we'd be giving an advisory meeting or that the judge should have no business actually honoring this subpoena due to take-home in this case because there's really no issue. Nothing's been framed. So we can't assign or delete the fact of the shot-fire alert in this case. A shot-fire alert happened. It was part of the mix there. It's mentioned three times in the arrest report. It's incumbent on us as defense counsel to investigate anything that seems relevant to Mr. Jones' defense. It certainly seems at this point that it's going to be relevant to a motion to suppress, and also as the state concedes in their brief that it may also be relevant to a course of conduct in this evidence. So that is we can't wait until the moment when we file the motion to suppress or the moment when we get to trial because then when we get to trial or the motion to suppress, all of a sudden an issue comes up about the reliability of shot-fire. And, oh, wait, I should have subpoenaed those documents before, but I can't, so I didn't, and now I'm stuck without doing that. There is no authority that says that we have to wait until something is on file. Certainly it's incumbent upon us to subject the state's case to meaningful adversarial testing. Well, when does that start? Does that start six months from now, or does that start when those lawyers who are appointed represent now? You know the answer. The responsibility to defend begins the moment that the attorney is appointed to represent his or her client. Absolutely. And we issued these subpoenas. Mr. Jones was arrested on this matter in November of 2021. We issued these subpoenas in February of 2022. There is no delay here, which is one of the next contractors. We jumped on this right away, and we have made it an issue. And there has been no delay occasioned by us. The delay has been occasioned by the Attorney General. Is there any evidence in the record that the Public Defender's Office is also questioning the reliability in general and wants this system of testing to be put to the test under FRI? I think, so, what significance FRI has to a Fourth Amendment issue is not super clear. But what we do know is there are no published decisions in Illinois regarding the FRI, whether or not this system meets the FRI standard for general acceptance in the scientific community. We know that. We know that there have not been any FRI hearings in Illinois that test this system. And, again, Mr. Parker points out that there have been hearings in other states, but we're talking about a system that is Chicago-specific and installed in Chicago specifically, which would be definitely an area of inquiry. So I think that one of the things the Court can consider, regardless of whether or not FRI comes into play in a Fourth Amendment context, is that there's nothing for you to rely on in terms of a FRI decision. There's nothing for you to take judicial notice of the fact that it is generally accepted. And our position would be that it's not. Our position would be that it does not meet FRI and that it does not meet general acceptance. Could you just summarize, too, just very briefly, what the Inspector General's report actually says about this system? The Inspector General's report essentially boils down to that the system very rarely comes up with actual evidence of a gun-related crime. That's 9.1 percent of cases. And that it is used and relied upon by the Chicago Police Department to effectuate arrests, believing that it is evidence of gunfire. I think the thing that can be seen from this record is the Chicago Police Department does believe that this is evidence of gunshots, because certainly that's how the officers react. That's how the officer in this case reacted to that shots fired alert. That officer says, I'm investigating a shots fired-related incident. So they are seeing and they are treating these alerts as actual evidence of gunfire, as reliable evidence of gunfire, and the record is simply not there to support that. But you're not saying that it's reliable evidence of gunfire. You're saying that it didn't result in the arrest. And like Justice Burke mentioned a little while ago, people leave within 15 minutes, or whatever the response time is for the police, with their gun. So obviously it wouldn't result in an arrest very often. No, and that could be what comes out as a factor of circumstances in this motion. However, if it turns out that there is a different set of facts, that somehow shots fired is relevant to this stop and miss defense, then I need those documents before I file that motion. I need those documents before I proceed upon that motion or I erase them. And I think that's one of the things that we see in many of the Fourth Amendment cases that have been cited here by shots fired and also by us. None of these cases talk about a very robust reliability challenge to shots fired. And in fact, United States v. Rickman, the Seventh Circuit case, they even directly say that, that the defendant in that case gave up and didn't ever fully make their record. About that case where they say that standing alone, that would never amount to any reason for the police to stop it. Absolutely, and I think that's also something the court can consider here. I want to take you back to relevancy for a second. So you seem to use materiality interchangeably with relevancy in your brief. And I want to know if there's a difference. And also you articulate a different standard than the one shots fired use for determining relevancy when subpoenaing records from a third party. They say records have to be known to be relevant, not just suspected to be relevant. What do you say to that? This whole standard of what defines relevancy for us? So the first thing I'll say is that People v. Falls, which is the recent Illinois Supreme Court case, specifically says materiality is not a different standard. Materiality encompasses the Nixon factors. So it's not a different standard. It's the same standard. It also encompasses Nixon and it encompasses some other cases that go along with it, which are also cited in our brief. If you look at the Nixon case itself, because I copied a case in my notes from it the other day, you use the word that it must be known to be evidentiary and relevant. That known to be is not in Nixon. The prong, the language in Nixon just says that the documents are evidentiary and relevant. Oh, so the known was actually put in by some other court. Yes, at some point. I'm not sure when that got added, but that's not what the language is in. So no citations of the authority. I'm sorry, did that answer your question? You answered my question and then my colleague asked you another question. You can continue. Sure. So, oh, yeah, every one of your requests was actually, it specified this particular report, didn't it? Weren't all of your seven? Yes, all of the requests in the ones that are numbered, the seven series, those were all limited to the alerts in this case. Some of the other subpoena requests were not, such as the reclassification notices, because those seek a wider data set. But certainly all of the seven were limited in that fashion. Another point, so materiality, which we know is, again, encompassing Nixon, but adds to more, we also know that Illinois case law contemplates that it's not just what may be admissible at trial, it's also what leads to what is admissible, that's Peoples v. Gladys. And it's a very low showing. We're talking at this point, again, the courts have very meager records here, very sparse records, which is very unusual in a criminal case. Normally we're not before you at this point talking about this. And so the standard post-conviction, in order to get a reversal of that conviction, is much higher with materiality. There's almost a Brady showing that has to be made in terms of that it would have changed the outcome of the trial. Here we're talking about we are pre-trial. It's a very low burden. We have shown that it's relevant and reliable. And the point that Schott's letter makes, that there should be some difference between what is available in discovery between the parties and what is available from a third party, there's no authority cited for that, first and foremost. And, second, it bags in absurd results. Because if a defendant is entitled to information, if we can make a showing that it's relevant and evidentiary to our case and it's necessary to prepare our side of the case for trial, it shouldn't matter where it comes from. If we're entitled to it, we're entitled to it. So you're saying it doesn't really matter if you try to get it from the police, who really does have this actual information, or the third party who does. Correct. You think the same standard of relevancy applies? Yes, I do. And I also agree with Mr. Parker insofar that this is an insufficient record. We are premature in deciding what significance a Schott's letter should play under the Fourth Amendment. This court would be in a much better position after I've received all these documents, after I've been able to put on a full and complete motion to the press, presented that record about reliability of the system. Once all of that has been done, this court would be in a much better position to decide what, if any, on a case of first impression for Illinois courts, what, if any, significance these alerts should have. And that's kind of the trouble, I think, for the court at this point, is that this is really just a bunch of conjecture. We're relying on an offhand comment from the state's attorney, just an arrest report. There's clearly a lot of other evidence in this case, witnesses that will testify, body-worn cameras. This court would be much better equipped to make a full and considered ruling as to that significance once we've been able to present all of that. And these documents are necessary for us to be able to do that. Anything further you want to add at this time? We're asking you to affirm the trial court. Thank you. And just so we're going to be clear when we ask Parker about the question about the request in Number 7, you're saying that the suggestion that he has made in his brief is not an accurate description of what you requested. Is that right? That is correct, yes. Okay. All right. Okay. Well, we'll let Mr. Parker explain that one to us. Sure. You won't have to do this, but I want to give you the page reference. Okay. It's appendix page 265. It has all the sevens. The first 7.1 is explicitly limited to November 7, 2021. The remainder have no date restriction at all. I'll gladly accept a date restriction, but they don't. Does it have the report number? It does. It starts with guardian, and it gives me a plus number, and then it says the remainder of the request. The problem I have is the first one has a date limitation, and the remainder do not. And so just sort of textual interpretation, when one has a date limitation and the remainder don't, I'm assuming that is a purposeful decision to exclude the date. If the limitation is to November 7th, I still object to this, of course, but I'll accept it. But that's not what the court said, and it's not how I read this opinion. Okay. But it does. Every single request for 7 refers to flex ID. I agree with you. 872-523-762. All of them. All of them. All right. But you're saying because they limited the first 7.1. Correct. From on or about November 7th, and that we should use statutory interpretation to interpret that. That's why I made the argument I made. I think it's a good faith argument. And I'm being told not to read it that way, and I would gladly not read it that way. But my argument was not incorrect, given the way it's written. Okay. All right. What do you want to say, Andrew Belloc? We're going to give you some time. Sure. Let you talk. Sure. I'm going to just be brief, but I would say that the argument that this is all conjecture, that somehow there needs to be a developed, and we're not even sure how the Fourth Amendment plays into the reliability on shots fired. That had nothing to do with shots fired reliability. That's the Fourth Amendment cases. We cite them already that you don't need to challenge reliability, including United States v. Rickman. But the whole argument about conjecture is precisely why I've asked that this be framed out more solidly and completely so they can bring the argument that they want, and then it can develop. Next. OIG report. It's actually a misstatement to say that shots fired was unreliable. It found that there were arrests, the number of arrests and evidence found after shots fired alert is low. It did not impugn the reliability of shots fired. There are many reasons why you might not make an arrest. For example, people don't stick around, or the response time is delayed. It does not mean that shots fired causes people to be arrested, directs the police to be arrested, and there is no evidence in the record that that is so. Finally, reclassification. It's important because if you write an opinion where I lose, that's fine. But it is not considered reclassification. It's not defined as reclassification when there's an alert. When it goes from the machine, the person listens to the noise and then sends the alert to the police. It's not withdrawn ever. It happens after. How long is your normal time frame between the sound that says this is a 99% chance that you're gunshot, then the human reviews it? Within a minute. Within a minute? And then how soon after that does it go to the police department? Immediately. I believe in Chicago it goes to a particular center that then forwards it to the police. So again, it's possible for the human not to send it to the police? They do all the time. So they say, oh no, that sounds like a firecracker. That's not considered a reclassification. That's not a reclassification. Why do they need a human to tell the machine, well, this is really a firecracker? Because I don't think they want to just rely on an algorithm. Humans are supposed to be intelligent, right? Yeah. Humans are stronger than the artificial intelligence that humans created. How would you describe a shot spotter? Is it a reliable informant, or is this really an anonymous tip? It doesn't matter. The second circuit calls it an anonymous tip. And what about the rest of the circuits? I don't think any of the circuits, the second circuit has dealt with it in terms of having a person testify about its reliability, essentially as an anonymous tip. Are you familiar with those cases about what happens when you get an anonymous tip? What the police are supposed to do? They're supposed to testify as to its reliability. Right. How do they normally do that? They testify about their own personal experience. No. Well, okay. I think we're going to disagree about that one, but, you know, anyway. They testify about their own personal experience with that anonymous tip, is what I'm saying. Yeah. And that's what people are doing in these cases. Well, normally, if it's an anonymous tip, there has to be something that the police officer sees when he gets there that suggests that this isn't just nothing. So, anyway, you're suggesting or you agree that at least the seventh circuit has referred to this as an anonymous tip, sir? I couldn't disagree because that's exactly what they say. Yeah. Okay. All right. Anything further to add? All right. Thank you. This was a very well-argued, well-briefed case. We will take it under advisement, and we're going to have to switch panels for our next forum.